No. 24-11892 (consolidated with 25-12813)

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

*Hispanic Federation, et al.*,
Plaintiffs-Appellees,

v.

*Florida Secretary of State, et al.*,
Defendants-Appellants.

U.S. District Court for the Northern District of Florida, Nos. 4:23-cv-215-MW-MAF,
4:23-cv-216-MW-MAF, and 4:23-cv-218-MW-MAF
(Walker, J.)

## DEFENDANTS-APPELLANTS FLORIDA SECRETARY OF STATE AND FLORIDA ATTORNEY GENERAL'S INITIAL BRIEF

Robert S. Schenck
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300

Mohammad O. Jazil
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, Florida 32301
(850) 270-5938

*Counsel for the Florida Attorney General*

*Counsel for the Florida Secretary of State*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Per Rule 26.1 and Circuit Rule 26.1-1 to 26.1-3, Defendants-Appellants Florida Secretary of State and Florida Attorney General certify that the following have an interest in the outcome of this case. Note that "Defendant(s)," as opposed to "Defendants-Appellants," refers to defendants in the case, other than the Florida Secretary of State and Florida Attorney General.

1.      ACLU Foundation of Florida, *Attorneys for Plaintiffs-Appellees*

2.      Adkins, Janet, *Defendant*

3.      Alachua County Attorney's Office, *Attorneys for Defendant*

4.      Alianza Center, *Plaintiff-Appellee*

5.      Alianza for Progress, *Plaintiff-Appellee*

6.      Alicea, Delmarie, *Attorney for Plaintiffs-Appellees*

7.      American Civil Liberties Union Foundation, *Attorneys for Plaintiffs-Appellees*

8.      Andersen, Mark, *Former Defendant*

9.      Anderson, Chris, *Former Defendant*

10.     Anderson, Shirley, *Defendant*

11.     Arnold & Porter Kaye Scholer LLP, *Attorneys for Plaintiffs-Appellees*

12.     Arnold, Melissa, *Former Defendant*

13.     Arrington, Mary Jane, *Defendant*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

14.  Artasanchez, Santiago, *Former Plaintiff*

15.  Babis, Olivia, *Declarant for Plaintiffs-Appellees*

16.  Baird, Maureen, *Defendant*

17.  Bardos, Andy, *Attorney for Defendants*

18.  Barton, Kim, *Defendant*

19.  Bell, Melony, *Defendant*

20.  Bender, Robert, *Defendant*

21.  Bennett, Michael, *Former Defendant*

22.  Bentley & Bruning, *Attorneys for Defendants*

23.  Bentley, Morgan, *Attorney for Defendants*

24.  Blazier, Melissa, *Defendant*

25.  Bledsoe, William, *Attorney for Defendant*

26.  Bobanic, Tim, *Defendant*

27.  Boettcher, Ellen, *Attorney for Plaintiffs*

28.  Brazil & Dunn, *Attorneys for Plaintiffs in Consolidated Case*

29.  Broward County Attorney's Office, *Attorneys for Defendant*

30.  Byrd, Cord, Florida Secretary of State, *Defendant-Appellant*

31.  Campaign Legal Center, *Attorneys for Plaintiffs in Consolidated Case*

32.  Campbell-Harris, Dayton, *Attorney for Plaintiffs-Appellees*

33.  Cannon, Starlet, *Former Defendant*

34.  Castor Dentel, Karen, *Defendant*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

35.  Cepeda Derieux, Adriel, *Attorney for Plaintiffs-Appellees*

36.  Chaires, Darbi, *Defendant*

37.  Chambless, Chris, *Defendant*

38.  Chason, Sharon, *Defendant*

39.  Conyers, Grant, *Defendant*

40.  Copper, Alexandra, *Attorney for Plaintiffs*

41.  Corley, Brian, *Defendant*

42.  Cowles, Bill, *Former Defendant*

43.  Cruz, Roberto, *Attorney for Plaintiffs-Appellees*

44.  Cycon, John, *Attorney for Defendants-Appellants*

45.  Darlington, Andrew, *Declarant for Defendants-Appellants*

46.  Darus, Lisa, *Defendant*

47.  Davis, Ashley, *Attorney for Defendant-Appellant*

48.  Davis, Vicki, *Defendant*

49.  Demos, *Attorneys for Plaintiffs-Appellees*

50.  Diaz, Jonathan Michael, *Attorney for Plaintiffs*

51.  Disability Rights Florida, *Plaintiff-Appellee*

52.  Doe, A, *Former Plaintiff*

53.  Doe, B, *Former Plaintiff*

54.  Doyle, Tommy, *Defendant*

55.  Driggers, Heath, *Defendant*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

56.    Dunaway, Carol, *Defendant*

57.    Dunn, Chad, *Attorney for Plaintiffs*

58.    Earley, Mark, *Defendant*

59.    Ebenstein, Julie, *Attorney for Plaintiffs-Appellees*

60.    Edwards, Lori, *Former Defendant*

61.    Elliot, Monica, *Declarant for Plaintiffs*

62.    Equal Ground Education Fund, *Former Plaintiff*

63.    Erdelyi, Susan, *Attorne for Defendants*

64.    Erdelyi, Susan, *Attorney for Defendants*

65.    Escambia County Attorney's Office, *Attorneys for Defendant*

66.    Farnam, Aletris, *Defendant*

67.    Farnham, Aletris, *Defendant*

68.    Farrington, Scott, *Defendant*

69.    Ferguson, Robert, *Attorney for Plaintiffs*

70.    Fitzpatrick, Martin A., *U.S. Magistrate Judge*

71.    Florez, Johana, *Declarant for Plaintiffs*

72.    Florida Alliance for Retired Americans, *Plaintiff-Appellee*

73.    Florida Attorney General's Office, *Attorneys for Defendant-Appellant*

74.    Florida Department of State, *Attorneys for Defendant-Appellant*

75.    Florida State Conference of Branches and Youth Units of the NAACP,

        *Plaintiff-Appellee*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

76.    Freedman, John, *Attorney for Plaintiffs-Appellees*

77.    Galindo, Miranda, *Attorney for Plaintiffs-Appellees*

78.    Garcia, Alina, *Defendant*

79.    Gardner Bist Bowden, *Attorneys for Defendants*

80.    GrayRobinson PA, *Attorneys for Defendants*

81.    Griffin, Joyce, *Former Defendant*

82.    Hankins, Christi Jo, *Attorney for Defendant*

83.    Hanlon, John, *Defendant*

84.    Hanson, Corbin, *Attorney for Defendant*

85.    Hart, Travis, *Defendant*

86.    Hass, Brian, *Defendant*

87.    Hays, Alan, *Defendant*

88.    Healy, Karen, *Defendant*

89.    Healy, Karen, *Defendant*

90.    Henderson Fanklin Starnes, *Attorneys for Defendants*

91.    Hernando County Attorney's Office, *Attorneys for Defendant*

92.    Herrera-Lucha, Veronica, *Plaintiff-Appellee*

93.    Herron, Mark, *Attorney for Defendant*

94.    Hillsborough County Attorney's Office, *Attorneys for Defendant*

95.    Hispanic Federation, *Plaintiff-Appellee*

96.    Hodie, Sherri, *Defendant*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

97.   Hogan, Mike, *Former Defendant*

98.   Holland, Jerry, *Defendant*

99.   Holtzman Vogel Baran Torchinsky & Josefiak, *Attorneys for Defendant-Appellant*

100.  Hoots, Brenda, *Defendant*

101.  Hutto, Laura, *Defendant*

102.  Hutto, Laura, *Defendant*

103.  Jarone, Joseph, *Attorney for Defendant*

104.  Jazil, Mohammad, *Attorney for Defendant-Appellant*

105.  Jonas, Sarah, *Attorney for Defendant*

106.  Jones, Tammy, *Defendant*

107.  Joshi, Raghav Vikas, *Declarant for Plaintiffs-Appellees*

108.  Jouben, Jon, *Attorney for Defendants*

109.  Kahn, Jared, *Attorney for Defendant*

110.  Karpatkin, Jeremy, *Attorney for Plaintiffs-Appellees*

111.  Katzman, Adam, *Attorney for Defendant*

112.  Keen, William, *Defendant*

113.  Keenan, Megan, *Attorney for Plaintiffs-Appellees*

114.  Khanna, Abha, *Attorne for Plaintiffs-Appellees*

115.  King, Blackwell, Zehnder & Wermuth P.A., *Attorneys for Plaintiffs-Appellees*

116.  Kinsey, Jennifer, *Defendant*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

117.  Klitsberg, Nathaniel, *Attorney for Defendant*

118.  Knight, Shirley, *Defendant*

119.  Konor, Estee, *Attorney for Plaintiffs-Appellees*

120.  Lakin, Sophia, *Attorney for Plaintiffs-Appellees*

121.  Lang, Danielle, *Attorney for Plaintiffs*

122.  Lapinig, Christopher, *Attorney for Plaintiffs*

123.  Latimer, Craig, *Defendant*

124.  Latimer, Craig, *Defendant*

125.  LatinoJustice PRLDEF, *Attorneys for Plaintiffs-Appellees*

126.  Lavancher, Denise, *Defendant*

127.  Lavia III, John, *Attorney for Defendant*

128.  League of Women Voters of Florida Education Fund, Inc., *Plaintiff*

129.  League of Women Voters of Florida, Inc., *Plaintiff*

130.  Leeper, Simone, *Attorney for Plaintiffs*

131.  Leinhart, Kaitlyn, *Defendant*

132.  Lenhart, Kaiti, *Former Defendant*

133.  Lewis, Lisa, *Defendant*

134.  Link, Wendy, *Defendant*

135.  Lux, Paul, *Defendant*

136.  Madduri, Lalitha, *Attorney for Plaintiffs-Appellees*

137.  Marcus, Julie, *Defendant*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

138. Mari, Frank, *Attorney for Defendant*

139. Marks Gray P.A., *Attorneys for Defendants*

140. Martinez, Norka, *Plaintiff-Appellee*

141. May, David, *Defendant*

142. McCrory, Hill, *Declarant for Plaintiffs*

143. McNamara, Caroline, *Attorney for Plaintiffs-Appellees*

144. Meadows, Therisa, *Former Defendant*

145. Messer Caparello & Self PA, *Attorneys for Defendant*

146. Messer, Ryan, *Defendant*

147. Miami-Dade Supervisor of Elections Office, *Attorneys for Defendant*

148. Milligan, Michelle, *Defendant*

149. Milton, Christopher, *Defendant*

150. Mobley, Valerie, *Declarant for Plaintiffs*

151. Morgan, Joseph, *Defendant*

152. Morse, Stephanie, *Attorney for Defendant-Appellant*

153. Nabors Giblin & Nickerson PA, *Attorneys for Defendant*

154. Negley, Mark, *Former Defendant*

155. Nguyen, Phi, *Attorney for Plaintiffs-Appellees*

156. Nordlund, Jared, *Declarant for Plaintiffs-Appellees*

157. Nweze, Adora Obi, *Declarant for Plaintiffs-Appellees*

158. O'Donnell, Renata, *Attorney for Plaintiffs-Appellees*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

159. Oakes, Vicky, *Defendant*

160. Office of the General Counsel, City of Jacksonville, *Attorneys for Defendant*

161. Olivo III, Geraldo, *Attorney for Defendants*

162. Ortega, Michael, *Attorney for Plaintiffs*

163. Osborne, Deborah, *Defendant*

164. Osbourne, Deborah, *Former Defendant*

165. Overturf, Charles, *Defendant*

166. Pennock, Amy, *Defendant*

167. Pettis, Deidra, *Defendant*

168. Pico, Elizabeth, *Plaintiff-Appellee*

169. Pierce, Rhonda, *Defendant*

170. Pinellas County Attorney's Office, *Attorneys for Defendant*

171. Pinkstaff, Tiffiny, *Attorney for Defendant*

172. Poder Latinx, *Plaintiff-Appellee*

173. Preminger, Evan, *Attorney for Plaintiffs-Appellees*

174. Prieto, Humberto Orjuela, *Plaintiff-Appellee*

175. Reynolds Perez, Devona, *Attorney for Defendant*

176. Riley, Heather, *Defendant*

177. Riley, Heather, *Former Defendant*

178. Roper Townsend & Sutphen, *Attorneys for Defendants*

179. Rosenthal, Oren, *Attorney for Defendant*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

180. Rudd, Carol, *Former Defendant*

181. Ruiz, Cesar, *Attorney for Plaintiffs-Appellees*

182. Rutahindurwa, Makeba, *Attorney for Plaintiffs-Appellees*

183. Sanchez, Connie, *Defendant*

184. Sanchez, Esperanza, *Former Plaintiff*

185. Schenck, Robert, *Attorney for Defendant-Appellant*

186. Scott, Dale, *Attorney for Defendant*

187. Scott, Dale, *Attorney for Defendant*

188. Scott, Joe, *Defendant*

189. Seyfang, Amanda, *Defendant*

190. Shaud, Matthew, *Attorney for Defendant*

191. Slater, Cynthia, *Declarant for Plaintiffs-Appellees*

192. Smith, Diane, *Defendant*

193. Smith, Diane, *Defendant*

194. Southerland, Dana, *Defendant*

195. Stafford, David, *Former Defendant*

196. Stewart, Gregory, *Attorney for Defendant*

197. Stinson-Brown, Tomi, *Defendant*

198. Swain, Robert, *Attorney for Defendant*

199. Swan, Leslie, *Defendant*

200. Taghdiri, Pausha, *Attorney for Defendants*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

201. Tartaglia, Melissa, *Attorney for Defendants*

202. Taylor, Sherry, *Defendant*

203. Tessitore Mari Scott PLLC, *Attorneys for Defendant*

204. Tilley, Daniel, *Attorney for Plaintiffs-Appellees*

205. Todd, Stephen, *Attorney for Defendant*

206. Turner, Ron, *Defendant*

207. UnidosUS, *Plaintiff-Appellee*

208. Uthmeier, James, Florida Attorney General, *Defendant-Appellant*

209. Valenti, Leah, *Defendant*

210. Vilar, Marcos, *Declarant for Plaintiffs-Appellees*

211. Villane, Tappie, *Defendant*

212. Volusia County Attorney's Office, *Attorneys for Defendant*

213. Voters of Tomorrow Action, Inc., *Plaintiff-Appellee*

214. Walker, Gertrude, *Defendant*

215. Walker, Mark E., *U.S. District Court Judge*

216. Ward, Nina, *Defendant*

217. Warren, Nicholas, *Attorney for Plaintiffs-Appellees*

218. Wermuth, Frederick, *Attorney for Plaintiffs-Appellees*

219. Wertz, Debbie, *Defendant*

220. White, Christina, *Former Defendant*

221. Wilcox, Wesley, *Defendant*

*Hispanic Federation, et al., v. Florida Secretary of State, et al.*
No. 24-11892 (consolidated with 25-12813)

222.  Williams, H. Russell, *Defendant*

223.  Williams, Kenya, *Defendant*

224.  Wyler, Douglas, *Attorney for Defendants*

Per Circuit Rule 26.1-2(c), Defendants-Appellants Florida Secretary of State and

Florida Attorney General certify that the CIP contained herein is complete.

Dated: October 31, 2025

/s/ Robert S. Schenck                    /s/ Mohammad O. Jazil
Robert S. Schenck                        Mohammad O. Jazil
*Counsel for Defendant-Appellant Florida*   *Counsel for Defendant-Appellant Florida*
*Attorney General*                       *Secretary of State*

# **TABLE OF CONTENTS**

Table of Authorities ...............................................................................................iii

Preliminary Statement ........................................................................................ vi

Statement Regarding Oral Argument ................................................................ 1

Introduction ........................................................................................................... 2

Jurisdictional Statement ..................................................................................... 3

Statement of the Issues........................................................................................ 3

Statement of the Case ......................................................................................... 4

      I. Factual Background ................................................................................. 4

           A. Registering to Vote in Florida.................................................. 4

           B. The Problems with 3PVROs.................................................... 5

           C. The Florida Legislature Passed SB7050 ............................... 10

      II. Procedural Background.......................................................................... 13

Standard of Review ............................................................................................ 13

Summary of the Argument................................................................................. 13

Argument .............................................................................................................. 15

      I. Florida's citizenship restriction serves a political function, complies with the principles of equal protection, and should be allowed to go into effect. ..... 15

           A. The Supreme Court "has many times…"................................ 15

           B. In this case, the district court applied… ................................. 18

           C. Had the district court applied the political function exception…........ 21

i

II. At the very least, Florida's citizenship restriction isn't *facially* unconstitutional under the equal protection clause. ....................................................................... 22

    A. Even if the political function exception doesn't apply… ..................... 22

    B. The district court refused to employ rational basis review… .............. 23

    C. This Court's decision in *Club Madonna v City of Miami Beach*… ............ 25

Conclusion ..................................................................................................... 26

Certificate of Compliance ............................................................................. 28

Certificate of Service ..................................................................................... 28

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Ambach v Norwick,*
    441 U.S. 68 (1979) ..................................................................... 17

*American Federation of State, County & Municipal Employees Council 79 v Scott,*
    717 F.3d 851 (11th Cir. 2013) ................................................... 22

*Bernal v Fainter,*
    467 U.S. 216 (1984) ........................................................17, 18, 20

*Bluman v FEC,*
    800 F. Supp. 2d 281 (D.D.C. 2011) ......................................... 19

*Bonner v Prichard,*
    661 F.2d 1206 (11th Cir. 1981) ................................................ 17

*\*Cabell v Chavez-Salido,*
    454 U.S. 432 (1982) ............................................... 15, 16, 17, 19

*\*Cervantes v Guerra,*
    651 F.2d 974 (5th Cir. Unit A July 1981) ........................... 17, 18, 20-21

*City of Chicago v Morales,*
    527 U.S. 41 (1999) ..................................................................... 22

*City of Los Angeles v Patel,*
    576 U.S. 409 (2015) ................................................................... 25

*Club Madonna v City of Miami Beach,*
    42 F.4th 1231 (11th Cir. 2022) ................................................ 25

*\*Estrada v Becker,*
    917 F.3d 1298 (11th Cir. 2019) ........................................16, 23, 24

*\*Foley v Connelie,*
    435 U.S. 291 (1978) ..........................................................15, 17, 23

*In re Griffiths,*
        413 U.S. 717 (1973) ................................................................................. 18

*Larson v Valente,*
        456 U.S. 228 (1982) ................................................................................. 24

*League of Women Voters of Florida, Inc. v Florida Secretary of State,*
        66 F.4th 906 (11th Cir. 2023) ................................................................ 13

*\*LeClerc v Webb,*
        419 F.3d 405 (5th Cir. 2005) ........................................................... 23, 24

*McGuire v Marshall,*
        50 F.4th 986 (11th Cir. 2022) ................................................................ 25

*Nyquist v Mauclet,*
        432 U.S. 1 (1977) .................................................................................... 15

*OPAWL v Yost,*
        118 F.4th 770 (6th Cir. 2024) ................................................................ 19

*Parents Involved in Community Schools v Seattle School District No. 1,*
        551 U.S. 701 (2007) ................................................................................. 24

*Planned Parenthood v Casey,*
        505 U.S. 883 (1992) ................................................................................. 22

*Sugarman v Dougall,*
        413 U.S. 634 (1973) ................................................................................. 18

*Takahashi v Fish & Game Commission,*
        334 U.S. 410 (1948) ........................................................................... 16, 19

*United States v Rahimi,*
        602 U.S. 680 (2024) ................................................................................. 26

*\*United States v Salerno,*
        481 U.S. 739 (1987) ..........................................................................*passim*

*United States v Virginia,*
        518 U.S. 515 (1996) ................................................................................. 24

**Statutes**

U.S. Constitution, Amendment XV, § 1 ..................................................... 18

28 U.S.C. § 1291 ........................................................................................... 3

28 U.S.C. § 1331 ........................................................................................... 3

Florida Statutes § 97.052 ............................................................................. 4

Florida Statutes § 97.053 .......................................................................... 4, 6

Florida Statutes § 97.055 ............................................................................. 6

Florida Statutes § 97.057 ............................................................................. 4

Florida Statutes § 97.0575 ................................................................... *passim*

Florida Statutes § 97.058 ............................................................................. 4

Florida Statutes § 97.0583 ........................................................................... 4

Florida Statutes § 97.05831 ......................................................................... 4

## **PRELIMINARY STATEMENT**

In this brief, the citation conventions are as follows:

- "Doc." citations refer to docketed documents in the district court. They are preceded with the case number for one of the two cases on appeal. The accompanying page numbers are the blue page numbers on the upper-right side of the docketed documents.

- For exhibits, "PX" refers to a Plaintiffs exhibit, and "DX" refers to a Defendants exhibit.

- For transcripts, "Tr." refers to the trial transcript and is usually followed by the witness who provided the referenced testimony. *E.g.*, Tr.1175:13-16 (Slater). Similarly, references to the legislative transcripts—PX246, PX248, PX250, PX252, PX254—identify the legislators or individuals who provided the referenced statements. *E.g.*, PX246 110:7-11 (Burgess).

The brief also refers to third-party voter registration organizations as 3PVROs

for the sake of consistency with the transcript and exhibits below.

## STATEMENT REGARDING ORAL ARGUMENT

The Secretary of State and Attorney General request oral argument. That's because the underlying issue in this appeal concerns a question of constitutional interpretation, namely the proper application of the Fourteenth Amendment's Equal Protection Clause to Florida's process for registering voters.

## **INTRODUCTION**

Citizens vote. Noncitizens don't. If Florida wants to exclude noncitizens from the first step in the voting process—the registration of voters—it can do so. That's because foreign citizens have no constitutional right to participate in the activities of democratic self-government. They are not part of Florida's *political* community.

It follows that the equal protection clause's *political* function exception applies to Florida's citizenship restriction on collecting voter registration applications. Fla. Stat. § 97.0575(1)(f). Because of the exception, the State's classification triggers only rational basis review. That rational basis is met, particularly when trial revealed that a canvasser left for Mexico without first submitting the applications entrusted to her.

The district court erred in concluding that the political function exception didn't apply, in subjecting Florida's citizenship restriction to strict scrutiny, and then in concluding that the restriction is facially unconstitutional. This Court should reverse.

At the very least, the facial unconstitutionality holding is wrong. *Salerno*'s no-set-of-circumstances test requires challengers to show that there is no set of circumstances under which the statute would be valid. But Florida's citizenship restriction is unquestionably valid when it comes to illegal aliens, asylum seekers, student visa holders, and temporary workers. That's because rational basis is all that's needed to justify the exclusion for all but the legal permanent resident, and the State's actions are rational. Fidelity to *Salerno* thus requires reversal of the district court's order (even if the public function exception doesn't apply to a voting-related function).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's final decision in two of the three cases consolidated for trial below: 4:23-cv-215 and 4:23-cv-218. Specifically:

- In case number 4:23-cv-215, the district court entered a final order and clerk's judgment on August 8, 2025. Docs.345, 346. The Secretary and Attorney General filed a timely notice of appeal on August 15, 2025. Doc.347. That appeal is case number 25-12813 before this Court.

- In case number 4:23-cv-216, the district court entered a final order and clerk's judgment on August 8, 2025. Docs.151, 152. Defendants prevailed. There's no appeal from Plaintiffs.

- In case number 4:23-cv-218, the district court entered partial summary judgment on March 1, 2024, Doc.149, and a final order and clerk's judgment on May 15, 2024, Docs.199, 200. The Secretary and Attorney General filed a timely notice of appeal on June 10, 2024. Doc.203. That appeal is case number 24-11892 before this Court.

The two appeals now before this Court have been consolidated under case number 24-11892.

## STATEMENT OF THE ISSUES

1.    Whether Florida's mandate that only citizens can collect the completed voter registration forms of their fellow citizens violates the Fourteenth Amendment's Equal Protection Clause.

3

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    Registering to Vote in Florida.

Among other things, the 2023 Florida Legislature barred every "third-party voter registration organization" from hiring any "person who is not a citizen" for the "collecting or handling" of "voter registration applications." Fla. Stat. § 97.0575(1)(f).

3PVROs are just one of the many means by which Floridians can register to vote. Floridians can register when they get their driver license. They can pick up a blank voter registration application at innumerable public buildings (a supervisor of elections office, library, tax collector's office, U.S. Department of Veteran Affairs building, and the Social Security Administration, among others), or even Walmart, and then hand deliver or mail the completed application to a supervisor of election's office or the Florida Division of Elections. *See, e.g.*, Fla. Stat. §§ 97.052, 97.053, 97.057, 97.0575, 97.058, 97.0583, 97.05831.

The application itself is easy to fill out. DX13 (voter registration application). It requires only a few affirmations about voting eligibility; a date of birth; a driver license number, Florida identification number, or the last four digits of a social security number; the voter's name and address; and signature. That's it.

A voter can also register with the help of third parties. A third party—whether a friend or an organization like the League of Women Voters or NAACP—can give a voter a blank voter registration application, tell the person how to fill it out, and give

4

the person a postage stamp, all so that the voter can deliver or mail the completed application. Plaintiff, League of Women Voters, uses this option. Tr.1213:19 – Tr.1214:13 (Scoon). A third party can also use an iPad to direct voters to the online registration portal, as the League of Women Voters now does, Tr.1217:9-15 (Scoon), and as Plaintiff, Poder Latinx, has long done as part of its "online first" approach to registration, PX883 at 23 (canvasser PowerPoint). QR codes—directing people to the online voter registration system—remain available too, as Plaintiff NAACP has shown. DX187 (Slater deposition designations); DX83 at 49 (Slater deposition).

Critically, a third party only becomes a third-party voter registration organization—a 3PVRO in election-law parlance—and thus subject to the citizen restriction at issue when it "collects" physical "voter registration applications" and "ensure[s]" that they are "promptly delivered" to the right elections official. Fla. Stat. § 97.0575(5)(a). Collection and delivery of someone's voter registration application is key. *Id.* Before engaging in this activity, a 3PVRO must register with the State. DX96 (registration form); Tr.1921:6 – 1922:10 (Matthews); *see also* PX780 (whitepaper); PX786 at 2 (League email); Tr.1296:4 – 1297:21 (Scoon); Tr.1180:9 – 1181:5 (Slater).

## B.    The Problems with 3PVROs.

3PVROs come with problems. Lots of problems.

To level set: a 3PVRO becomes "a fiduciary" to the voter who hands them an application. Fla. Stat. § 97.0575(5)(a). Put another way, an eligible voter entrusts a

3PVRO—or more specifically a registered canvasser for a 3PVRO—with his or her completed voter registration application.

As a fiduciary, timing is critical. The 3PVRO (through its canvassers) must deliver every application in its possession to an election official "within 10 days" of the application being completed or before "registration closes for the next ensuing election." Fla. Stat. § 97.0575(5)(a). That's so because if the registration deadline passes for the next election, then the applicant can't vote in that election. Fla. Stat. §§ 97.053(2), 97.055. The eligible voter is disenfranchised.

Accuracy is important, too. For example, turning a Democrat into a Republican or a Republican into a Democrat on the application results in the voter being unable to cast a ballot in a party primary. Again, the eligible voter is disenfranchised.

Finally, 3PVROs must ensure that canvassers working for them don't misappropriate information on a voter registration form—the name, home address, driver license number, last four digits of the social security number, or signature.

Yet this case includes over 300 exhibits where state officials alleged misconduct against 3PVROs, ranging from missed deadlines to the fabrication and misappropriation of voter information. *See* PX266 – PX401; PX406 – PX646; DX26 – DX29. The record also includes the testimony of prosecutors from throughout Florida (Fox, Gladson, and VanderGiesen) who discussed their experiences investigating, arresting, and convicting paid canvassers working for 3PVROs.

6

Hard Knocks is the most high-profile case of a 3PVRO behaving badly. Tr.1791:17 – 1795:24 (Fox). In less than one year, between 2022 and 2023, Hard Knocks received four letters from the Department of State, alleging a slew of election law violations. PX266 (first letter); PX280 (second letter); PX331 (third letter); PX328 (fourth letter). The fourth and final letter said that:

> In the two letters last year, dated September 29, 2022 [PX266], and November 29, 2022 [PX280], you were fined a total of $33,400.00. That number could have been as high as $191,500.00 but for a statutory cap of fines. Your actions addressed in those two letters negatively affected approximately 2,779 voter applicants and/or registrants.

PX328 at 1.

Hard Knocks was the subject of a criminal investigation, as well. The investigation linked dozens of fraudulent voter registration applications to the 3PVRO. Tr.1793:17-22 (Fox). Criminal charges weren't brought against Hard Knocks itself because the prosecutor determined that current laws didn't allow the entity itself to be charged. Tr.1793:5-11 (Fox). But several Hard Knocks canvassers were charged in February 2023 and convicted. Tr.1793:1-4, 12-16 (Fox); Tr.1812:10 – 1813:3 (Fox).

There are other high-profile cases. There's Cheryl Hall, who, while working for Florida First, a 3PVRO, changed the party affiliation of over 500 voter registration applications without the voter's consent. Tr.1774:12 – 1776:15 (Gladson); Tr.1823:7 – 1824:8 (Hays). There's also Royal Shepherd who altered, omitted, and forged signatures on "hundreds and hundreds" of applications. Tr.790:11 – 791:7 (Earley). He was a

canvasser who either "work[ed] for different 3PVROs or a company" hired by many 3PVROs. Tr.792:24 – 793:5 (Earley).

Florida Democrats—seemingly every Democratic member of the Florida Legislature—also raised the alarm about 3PVRO activity. In 2022, led by then-Senator Taddeo, the Democratic caucus wrote a letter to Attorney General Merrick Garland. Tr.492:2 – 493:1 (Torres); Tr.506:22 – 507:11 (Torres). In it, the Democrats alleged that a 3PVRO changed a South Florida woman's party affiliation on her voter registration application without her consent and asked the Department of Justice for help to address this 3PVRO problem. PX983 (letter); PX982 (article on letter).

Countless other cases have an equally detrimental effect. The misconduct, and allegations of misconduct, include:

- Untimely submitting voter registration applications. *E.g.*, Tr.61:9-10 (Nordlund); Tr.557:20 – 558:3 (Wassmer); Tr.582:11-15 (Velez Burgos); Tr.1207:24 – 1208:4 (Scoon).

- Untimely submitting applications after book closing and potentially disenfranchising voters. *E.g.*, PX452 at 2 (People Power fine letter).

- Canvassers (ostensibly) impersonating state officials and getting into altercations with voters. *E.g.*, PX845 (Hispanic Federation incident).

- Canvassers fraudulently signing applications. *E.g.*, Tr.55:19 – 56:6 (Nordlund); Tr.127:4-21 (Nordlund).

- Canvassers registering dead people. *E.g.*, Tr.729:21 – 730:4 (Herrera-Lucha); Tr.1728:6-17 (VanderGiesen).

8

- Canvassers altering information on applications or switching voters' party affiliation. *E.g.*, Tr.792:9-23 (Earley); Tr.1175:13-16 (Slater); Tr.1728:6 – 1729:2 (VanderGiesen).

- Canvassers filling out forms for fictitious people. *E.g.*, Tr.1728:6-13 (VanderGiesen).

*See also* PX266 – PX401; PX406 – PX646; DX26 – DX29.

There's even a quota requirement for canvassers. Tr.170:3-9 (Orjuela); Tr.192:2 – 193:2 (Sanchez). That's troubling, because quotas violate state law. Fla. Stat. § 104.012.

Apparently, some 3PVROs also data-mine information from collected voter registration applications. Tr.34:5-13 (Nordlund); Tr.36:8-16 (Nordlund); Tr.38:16-24 (Nordlund); Tr.42:13-18 (Nordlund); Tr.554:19-24 (Wassmer); Tr.611:14-16 (Velez). Voters aren't informed about the data-mining activity. Tr.121:5-12 (Nordlund); Tr.554:11-13 (Wassmer). Canvassers collecting applications for the 3PVRO are left in the dark, as well. Tr.152:5-25 (Orjuela); Tr.169:22 – 170:2 (Orjuela); Tr.174:25 – 175:6 (Orjuela); Tr.188:14-21 (Sanchez); Tr.189:11-14 (Sanchez).

Importantly for this appeal, misconduct isn't limited to citizens helping citizens register to vote, either. For example, three noncitizen canvassers with Mi Vecino were terminated due to misconduct in Orange County. Tr.407:5-22 (Herrera-Lucha). And, in 2022, a Hispanic Federation canvasser "left for Mexico for 10 days" and failed to timely deliver three voter registration applications. PX847 (incident email); Tr.613:17 – 615:5 (Velez Burgos). This canvasser was likely a noncitizen, given that "a little bit higher than 70 percent" of Hispanic Federation canvassers in "2022" were "noncitizens." Tr.586:6-

9 (Velez Burgos). Indeed, with noncitizens, it's rational to assume that there's always a higher risk that they can leave the state, given their strong ties to other countries, and not turn in applications on time. *See generally* Tr.171:4-19 (Orjuela); Tr.389:8-15 (Herrera-Lucha).

## C.    The Florida Legislature Passed SB7050.

The State is aware of the misconduct. In both 2023 and 2024, the Office of Election Crimes and Security published a report on election misconduct in Florida and discussed misconduct coming from 3PVROs. DX14 (2023 report); DX15 (2024 report). The 2023 report—published a few months before the 2023 legislative session—stated that:

> During 2022, the [office] also reviewed a large number of complaints involving Third Party Voter Registration Organizations (3PVROs). A number of these organizations were reported by election officials for failing to timely comply with statutory obligations—most significantly, failure to timely turn in voter registration applications. The [office] reviewed *approximately 3,077 voter registration applications that were collected and submitted untimely by 3PVROs*, in violation of section 97.0575, Fla. Stat. The [office] assessed statutory fines in the amount of $41,600.00 against those 3PVROs that did not comply with the statutory requirements. *See* section 97.0575(3)(a)1-3, Fla. Stat.

> The [office] has also made a number of criminal referrals related to 3PVROs; specifically, the referrals targeted voter registration agents employed by 3PVROs, who are alleged to have committed fraud, engaged in identity theft, changed a voter's party affiliation, registered deceased individuals, or registered fake individuals, among other violations. Many of these criminal referrals are still pending and remain under active criminal investigation with law enforcement.

DX14 at 5 (emphasis added); *see also* DX15 at 5, 7-9 (2024 report).

10

It's against this background that the 2023 Florida Legislature enacted Senate Bill 7050, including its citizenship restriction for 3PVRO canvassers. The bill was an omnibus elections package, addressing election issues as varied as list maintenance, candidate nicknames, resign to run, and much, much more. Tr.490:8 – 491:11 (Torres); Tr.921:16 – 922:24 (Eskamani).

SB7050 contained several 3PVRO-related provisions, too. Senator Burgess, the bill's sponsor, explained the need for additional 3PVRO regulations:

> [T]hird-party voter registration organizations, they're not an official arm of the supervisor of elections office. They're private organizations that are electing to again act as a fiduciary. It's an immense responsibility.
>
> And there's currently, I believe, around just under like 2000 that are registered in the state of Florida alone. They've been around since, I believe, about 2005. There's been regulations on the books for these organizations. Every cycle—reading historically and to date—there's additional issues that arise with these organizations, which is prompting the additional need for enhanced measures of protection for the voter….
>
> [T]his is about the accountability for the voter. At the end of the day, that's what really matters, and regardless of the purpose, you know, for a third-party voter registration organization, we are legislating to protect the voter, and that's the sole purpose of all the provisions within this and the guiding light behind all the third-party voter registration organizations provisions.

PX246 60:9 – 61:10; *see also* PX250 55:18 – 56:5 (Byrd); PX252 27:1 – 28:3 (Burgess).

Senator Burgess even mentioned the 2023 Office of Election Crimes and Security Report, noting:

> And in 2022 alone, the OECS—the Office of Election Crimes and Security—reviewed approximately—it was over 3000 voter registration applications that were collected and submitted untimely by third-party

11

voter registration organizations, which is a violation of the statute. The assessed fines in 2022 were in excess of $41,000 against those.

PX246 34:22 – 35:4; DX14 at 5 (report); *see also* PX252 33:10 – 34:2 (Burgess) (same).

Hard Knocks was mentioned, as well. That's no surprise when most of its misconduct happened in the then-Florida Senate President's district, Tr.1791:6-16 (Fox), and the Secretary of State testified before the legislature about Hard Knocks, PX250 54:1 – 55:6; *see also* PX248 69:25 – 70:1 (Byrd).

Reforms were thus inevitable. Among them were restrictions on the retention of information, Fla. Stat. § 97.0575(7), the requirement to provide a receipt to every applicant helped, Fla. Stat. § 97.0575(4), and increased fines, Fla. Stat. § 97.0575(5).

Most relevant to this appeal, SB7050 added the following citizenship restriction for 3PVROs collecting voter registration applications:

> An affirmation [from the 3PVRO] that each person collecting or handling voter registration applications on behalf of the third-party voter registration organization is a citizen of the United States of America. A third-party voter registration organization is liable for a fine in the amount of $50,000 for each such person who is not a citizen and is collecting or handling voter registration applications on behalf of the third-party voter registration organization.

Fla. Stat. § 97.0575(1)(f). Legislators justified the citizenship restriction to protect sensitive information on voter registration applications from foreign citizens, and as a means of defining Florida's political community. *See, e.g.*, PX248 3:13-17 (McClure); PX250 112:9-12 (Burgess); PX252 5:10 – 6:7 (Hudson); PX252 15:7-16 (Hudson); PX252 16:7 – 17:16 (Burgess); PX254 7:1-7 (McClure); PX254 7:16 – 8:2 (McClure).

12

## II.    Procedural Background

Three lawsuits followed: *NAACP, et al., v. Byrd*, Case No. 4:23-cv-215; *League of Women Voters of Florida, et al., v. Byrd*, Case No. 4:23-cv-216; and *Hispanic Federation, et al., v. Byrd*, Case No. 4:23-cv-218. The three cases were consolidated for a seven-day bench trial on issues ranging from intent-based equal protection and statutory challenges to Voting Rights Act and *Anderson-Burdick* claims. In the end, the district court enjoined the State from enforcing the citizenship restriction in section 97.0575(1)(f). *See* Case No. 4:23-cv-215, Doc.346; Case No. 4:23-cv-218, Doc.200.

The district court held that Florida's citizenship restriction "facially discriminates against noncitizens in violation of the Equal Protection Clause of the Fourteenth Amendment." Case No. 4:23-cv-218, Doc.199 at 2-3. The Secretary and Attorney General appealed the district court's decision.

## STANDARD OF REVIEW

"In reviewing a judgment following a bench trial, [this Court] review[s] *de novo* both conclusions of law and the application of the law to the facts." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 921 (11th Cir. 2023) (citing *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1322 (11th Cir. 2018)). This case presents only questions of law and application of law to the facts.

## SUMMARY OF THE ARGUMENT

**I.** Florida's citizenship restriction for 3PVROs satisfies the Fourteenth Amendment's Equal Protection Clause. A distinction between citizens and noncitizens

13

when it comes to voter registration serves a public function. Registering to vote is the first step in exercising the vote—a right that's the quintessential mark of democratic self-government. This distinction, rooted in a public function, thus triggers rational basis review. And rational basis is met: the State acts rationally when it's better defining its political community. It acts rationally when it's reducing the chance of a noncitizen, with ties to another country, leaving the United States without first turning in voter registration forms entrusted to them. And it acts rationally when excluding noncitizens from a step in the voting process to boost public confidence.

**II.** The district court's conclusion that the State's citizenship restriction is facially unconstitutional suffers from another flaw. Because the State's distinction affects legal permanent residents, the district court subjected the citizenship restriction to strict scrutiny (after concluding that the public function exception doesn't apply). But the citizenship restriction affects all other categories of noncitizens, as well: the illegal alien, the asylum seeker, the student visa holder, and the temporary worker. For all but the legal permanent resident, rational basis review applies. And that standard is met. This means that under *Salerno*'s no-set-of-circumstances test for facial unconstitutionality, the citizenship restriction can't be facially unconstitutional. In all but one circumstance—for the legal permanent resident—the statute is clearly constitutional even if the political function exception doesn't apply to a voting-related function.

This Court should reverse. Florida should be allowed to say that only citizens can collect and handle the completed voter registration applications of other citizens.

## ARGUMENT

I. **Florida's citizenship restriction serves a political function, complies with the principles of equal protection, and should be allowed to go into effect.**

**A.** The Supreme Court "has many times considered state classifications dealing with aliens" under the equal protection clause. *Cabell v. Chavez-Salido*, 454 U.S. 432, 436 (1982) (collecting cases). The Court has applied different levels of scrutiny to these cases. And though the decisions "have not formed an unwavering line over the years," "to say that the decisions do not fall into a neat pattern is not to say that they fall into no pattern." *Id.* "[B]road principles are articulated" and "narrowed when applied to new contexts." *Id.*

*First*, consider the broad principles. The type of alien matters. The federal government's decision to "admit the alien to permanent residence" status usually results in strict scrutiny of laws that exclude these permanent residents. *Foley v. Connelie*, 435 U.S. 291, 295 (1978). "It would be inappropriate, however, to require every statutory exclusion of [the legal permanent resident] to clear the high hurdle of 'strict scrutiny,' because to do so would 'obliterate all the distinctions between citizens and aliens, and thus depreciate the historic values of citizenship.'" *Id.* (quoting *Nyquist v. Mauclet*, 432 U.S. 1, 14 (1977) (Burger, C.J., dissenting)). The type of regulation thus matters, too. The State has "broad power to define its *political* community." *Cabell*, 454 U.S. at 440 (emphasis added) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 643 (1973)). But, from the earliest alienage cases, *economic* exclusions against lawful permanent residents are the

15

most scrutinized and struck down. *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948) (prohibition on Japanese fishermen); *see also Cabell*, 454 U.S. at 439 ("restrictions on lawfully resident aliens that *primarily affect economic interests* are subject to heightened judicial scrutiny," but "strict scrutiny is out of place when the restriction primarily serves a *political function*" (emphasis added)).

*Second*, consider the application of these broad principles. "The Supreme Court has never applied strict scrutiny review to a state law affecting any alienage classifications except for those involving resident aliens or permanent resident aliens…." *Estrada v. Becker*, 917 F.3d 1298, 1309 (11th Cir. 2019) (cleaned up) (quoting *LeClerc v. Webb*, 419 F.3d 405, 416 (5th Cir. 2005)). Lower courts, including this Court, have followed suit even where the aliens had been in this country for years and were often brought here by their parents, *id.* at 1308-11; the courts have consistently refused "to extend the Supreme Court's decisions concerning resident aliens to different alien categories," *id.* at 1310. In application, then, rational basis review applies to all aliens except the alien who's a legal permanent resident.

For the legal permanent resident, drawing a line between *political* function and *economic* exclusion has proven context specific. Or, put another way, it's proven difficult.

There's a test, sort of. "First, the specificity of the classification will be examined: a classification that is substantially overinclusive or underinclusive *tends* to undercut the governmental claim that the classification serves legitimate political ends." *Cabell*, 454 U.S. at 440 (emphasis added). "Second, even if the classification is sufficiently tailored,

16

it may be applied in the particular case only to 'persons holding state elective or important nonelective executive, legislative, and judicial positions'"—to "those officers who 'participate directly in the formulation, execution, or review of broad public policy' and hence 'perform functions that go to the heart of representative government.'" *Id.* (quoting *Sugarman*, 413 U.S. at 647). For this second step, the "language is far reaching and no limits on it were suggested by [the Supreme Court]." *Id.* at 440 n.7. "Rather," courts must "look to the importance of the function as a factor giving substance to the concept of democratic self-government." *Id.* While the Court's most recent alienage case, *Bernal v. Fainter*, said that the exception's "ambit" is "narrow," it nevertheless repeated the two-part test and said that the test merely "focus[es]" the "inquiry"—that the test is non-exhaustive and focuses on the function. 467 U.S. 216, 224 (1984).

Applied to specific cases, the results of the non-exhaustive, all-encompassing political function test are these. Excluding permanent resident aliens from being teachers serves a political function. *Ambach v. Norwick*, 441 U.S. 68, 80-81 (1979). So does excluding them from being cops, *Foley*, 435 U.S. at 299-300, from being probation officers, *Cabell*, 454 U.S. at 447, and from serving on petit or grand juries, *Cervantes v. Guerra*, 651 F.2d 974, 980-81 (5th Cir. Unit A July 1981) (citing *Perkins v. Smith*, 426 U.S. 913 (1976)).[1] Most importantly, an exclusion from voting in any election serves a political function. *Id.* (citing *Skafte v. Rorex*, 430 U.S. 961 (1977)). Not so from being

---

[1] *Cervantes* is binding precedent in this Court. *See Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

notaries, *Bernal*, 467 U.S. at 227-28, or lawyers, *In re Griffiths*, 413 U.S. 717, 729 (1973), or members of the New York civil service, *Sugarman*, 413 U.S. at 641-42.

**B.** In this case, the district court applied the Supreme Court's political function test and concluded that the handling and collection of completed voter registration forms doesn't serve a political function. *See* Case No. 4:23-cv-215, Doc.101 at 33 (citizenship discussion followed to final order Doc.345); Case No. 4:23-cv-218, Doc.68 at 33 (same for Doc.149). It then applied strict scrutiny and found that Florida's citizenship restriction is facially unconstitutional. The district court erred. Badly.

To state the obvious: voting serves a political function, perhaps the essential political function in a democracy. *Cervantes*, 651 F.2d at 980-81 (citing Supreme Court precedent). That function is reserved only for citizens of the United States. The Constitution protects only "[t]he right of citizens of the United States to vote," not legal permanent residents or other aliens. U.S. Const. amend. XV, § 1.

And Florida's citizenship restriction concerns an important step in the voting process: registering to vote. Every canvasser for every 3PVRO "serves as a fiduciary to the [citizen] applicant," ensuring that "any voter registration application entrusted to the organization, irrespective of party affiliation, race, ethnicity, or gender" is "delivered to the [Department of State] or the supervisor of elections in the county in which the applicant resides" within a specified timeframe so that the citizen can qualify to cast a ballot. Fla. Stat. § 97.0575(5)(a). That's the only job of a canvasser.

18

If voting is reserved only for citizens, and Florida's citizenship restriction concerns an important step in the process of voting, it follows that Florida can exclude *all* noncitizens from participating. This case is about as far from the type of economic exclusion struck down in *Takahashi* and about as close to a political-community-defining function as it gets.

Then-judge Kavanaugh seemingly agreed in *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (three-judge panel). There, writing for the three-judge court, he surveyed the Supreme Court cases and said that the cases "set forth a straightforward principle" that "[i]t is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, *activities* of democratic self-government." *Id.* (emphasis added). The activity at issue in *Bluman* was campaign contributions. And the principle articulated made no distinctions based on the type of alien. The principle should apply to the activity of voter registration, too, which is a more critical first step in the voting process than contributing to a campaign. *Cf. OPAWL v. Yost*, 118 F.4th 770 (6th Cir. 2024) (upholding state bar on foreign campaign contributions without carveout for legal permanent residents, which the statute in *Bluman* had).

 Working through the Supreme Court's two-part test yields the same result. The first part asks whether the citizenship provision is "substantially overinclusive or underinclusive." *Cabell*, 454 U.S. at 440. It's neither. The provision isn't substantially overinclusive because it applies only to those collecting or handling a U.S. citizen's voter

registration application. Nor is it substantially underinclusive. True, postal workers and state employees can handle voter registration applications without every postal worker or state employee being a citizen. *See* Case No. 4:23-cv-215, Doc.101 at 31-32; Case No. 4:23-cv-218, Doc.68 at 31-32. But 3PVROs are the only *non-governmental* entities authorized to collect and handle these important *governmental* forms once someone completes them. No federal, state, or local government has any day-to-day insights into a 3PVRO's hiring or firing practices, its training, or other safeguards when handling a voter registration application. Treating those working for 3PVROs differently than those working for the postal service, the DMV, or the Department of State makes sense. The provision isn't "fatally underinclusive." *Bernal*, 467 U.S. at 222.

The second prong is met, too. It asks whether an exclusion "implicate[s] responsibilities that go to the heart of representative government." *Id.* at 225. Considerations include an assessment of whether the "nonelective" position at issue is "important" and whether its holders "participate directly in the formulation, execution, or review of broad public policy," but "the actual *function* of the position" serves "as the dispositive factor." *Id.* at 222-23 (emphasis in original).

It's the actual function that mattered most to the former Fifth Circuit in *Cervantes* when permanent resident aliens challenged the exclusion of noncitizens from serving on or voting for the board of a local nonprofit. *Cervantes*, 651 F.2d at 975. The nonprofit had a localized focus, wasn't exactly a state or federal entity, and its board performed the government-like function of alleviating poverty in the area. *Id.* at 976-77. The public

20

function exception was still met because "voting in a public election is always within the political functions exception." *Id.* at 981.

As discussed above, the actual function in this instance is inherently political: helping register people to vote by collecting their completed voter registration applications. It follows that the political function exception is met.

**C.** Had the district court applied the political function exception, the State's citizenship restriction would have easily satisfied rational basis review. Florida has a rational—in fact, compelling—interest in ensuring that the voter registration applications of every voter are delivered in a timely manner. Putting the applications in the hands of those with illegal or temporary status, or those who may leave the country voluntarily or involuntarily any day and without warning, increases the odds of a registration application being delivered after the statutory deadlines. *Cf.* Tr.171:4-19 (Orjuela) (discussing ties in foreign country); Tr.389:8-15 (Herrera-Lucha) (same).

More to the point, in this case, trial showed that a Hispanic Federation canvasser "left for Mexico for 10 days" and failed to timely deliver three voter registration applications. PX847 (incident email); Tr.613:17 – 615:5 (Velez Burgos). This canvasser was likely a noncitizen, because "a little bit higher than 70 percent" of Hispanic Federation canvassers in "2022" were "noncitizens." Tr.586:6-9 (Velez Burgos).

What's more, excluding noncitizens from the voter registration process helps improve voter confidence. Every step in the election process is now highly scrutinized. Where there's evidence of noncitizen canvassers behaving badly, Tr.407:5-22 (Herrera-

Lucha) (discussing termination due to misconduct), it's rational for the State to exclude noncitizens from a step in the process of voting to bolster confidence in the process.

In sum, the district court erred in failing to apply the political function exception and in concluding that Florida's citizenship restriction violates the equal protection clause. This Court should reverse.

## II. At the very least, Florida's citizenship restriction isn't *facially* unconstitutional under the equal protection clause.

**A.** Even if the political function exception doesn't apply, the district court still erred in finding the State's citizenship restriction to be facially unconstitutional. In 1987, three years after the Supreme Court decided its last alienage case, the Court said in *United States v. Salerno* that a "facial challenge to a legislative Act" requires the challenger to "establish that no set of circumstances exists under which the Act would be valid." 481 U.S. 739, 745 (1987). Though criticized, *see City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (Stevens, J., concurring with two others), and not applied in the context of facial challenges to abortion laws, *Planned Parenthood v. Casey*, 505 U.S. 833, 895 (1992), *Salerno*'s no-set-of-circumstances test still applies in alienage cases. This "most difficult" test for facial challenges isn't met when it comes to Florida's citizenship restriction. *Salerno*, 481 U.S. at 745; *see also Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) (collecting cases) ("[T]he strict 'no set of circumstances' test is the proper standard for evaluating a facial challenge." (quoting *GeorgiaCarry.Org, Inc v. Georgia*, 687 F.3d 1244, 1255 & n.19 (11th Cir. 2012))).

Florida's citizenship restriction limits the "collecting or handling" of "voter registration applications on behalf of the third-party voter registration organization" to "a citizen of the United States of America." Fla. Stat. § 97.0575(1)(f). All noncitizens are excluded from collecting or handling applications regardless of their alienage status. That includes the illegal alien, the student visa holder, the temporary worker, the asylum seeker, and anyone else for whom there's been no "congressional determination to admit the alien to permanent residence" as a member of "the community." *Foley*, 435 U.S. at 295. Yet every time the government excludes a non-permanent resident from collecting or handling a voter registration application, the government must only provide a rational basis for that exclusion. *See Estrada*, 917 F.3d at 1310-11; *LeClerc*, 419 F.3d at 415.

**B.** The district court refused to employ rational basis review for *any* application of the statute because that, the court said, would require it to "parse the text" of the citizen provision "into two subgroups to determine the applicable standard of review." Case No. 4:23-cv-215, Doc.101 at 28; Case No. 4:23-cv-218, Doc.68 at 28. The court reasoned that the statutory text limits the "collecting or handling" of "voter registration applications" to a "citizen of the United States," Fla. Stat. § 97.0575(1)(f), "noncitizens" include permanent resident aliens, and so strict scrutiny applies, proving fatal for the Florida citizenship restriction. Case No. 4:23-cv-215, Doc.101 at 28-30; Case No. 4:23-cv-218, Doc.68 at 28-30.

23

The analysis isn't quite so simple. Any statute that makes a distinction based on race—regardless of a specific race—triggers strict scrutiny. *E.g.*, *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). Any statute that "makes explicit and deliberate distinctions between different religious organizations" also triggers strict scrutiny regardless of the religion. *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982). And any distinction based on sex—whether it benefits men or women—triggers intermediate scrutiny. *E.g.*, *United States v. Virginia*, 518 U.S. 515, 555 (1996). For *Salerno*'s no-set-of-circumstances test, that means strict scrutiny applies to *any* facial classifications based on *any* race and religion, and intermediate scrutiny applies to *any* facial classifications based on *either* sex.

Alienage is different, however. Unlike race, religion, or sex, the level of scrutiny ebbs and flows based on the kind of alien. As noted above, rational basis applies for all but the permanent resident aliens. *See Estrada*, 917 F.3d at 1310-11 (illegal aliens); *LeClerc*, 419 F.3d at 415 (temporary workers and students). Choosing one, and only one, level of scrutiny for *Salerno*'s no-set-of-circumstances test isn't appropriate when a statute speaks in terms of citizens and noncitizens. Subsumed within the noncitizen category are a multitude of subcategories. Rational basis applies to all but one of those subcategories, the legal permanent resident.

And even if strict scrutiny applies to the claims brought by a handful of legal permanent residents in this case and Florida's citizenship restriction fails under that level of scrutiny, it's still constitutional for all other aliens. Plaintiffs have failed to meet

24

their "burden of proving that the law could never be applied in a constitutional manner." *McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022) (quoting *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007)).

**C.** This Court's decision in *Club Madonna v. City of Miami Beach*, 42 F.4th 1231 (11th Cir. 2022), doesn't require a contrary result. *Club Madonna* read *Salerno* as asking "whether the statute" being challenged "fails the relevant constitutional test." *Id.* at 1256. But, as discussed above, the trouble here is that different tests (rational versus strict) apply based on the kind of alien. This isn't an instance of avoiding facial unconstitutionality based on a "hypothetical situation." *Id.*

The Supreme Court's decision in *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), helps drive home the point about hypothetical situations. In *Patel*, the city attempted to defend from facial challenge a law requiring hotel owners to make information available to the police on demand and without a warrant. *Id.* at 412. It said that the law couldn't facially violate the Fourth Amendment because a hotel owner might consent to the search, the police could conduct a search in an exigency, or a court might happen to issue a warrant. *Id.* at 417-18. The Court rejected this attempt to sidestep *Salerno*. It explained that "the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant." *Id.* at 418. So, the Fourth Amendment's test applied to assess the law's facial constitutionality for the situations that fell within the law's ambit.

25

In this case, the proper inquiry thus focuses on all noncitizens. For a plaintiff to succeed on a facial challenge, that plaintiff must "establish that no set of circumstances exists under which the Act would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024). Plaintiffs can't do so in this case. It's neither hypothetical nor irrelevant to consider its application to illegal aliens, asylum seekers, student visa holders, and temporary workers. All fall within the broader category of noncitizens. All are impacted by Florida's citizenship restriction. And for all but the legal permanent resident—even if the public function exception doesn't apply—the statute is subjected to rational basis review and is constitutional.

## CONCLUSION

For these reasons, the State asks this Court to reverse the district court's decision. Florida should be allowed to implement its citizenship restriction.

Dated: October 31, 2025

JAMES UTHMEIER
  *Attorney General*

/s/ Robert S. Schenck
Robert S. Schenck
  ASSISTANT SOLICITOR GENERAL
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300
robert.schenck@myfloridalegal.com

Ashley E. Davis
  GENERAL COUNSEL
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building, Suite 100
500 South Bronough Street
Tallahassee, Florida 32399
 (850) 245-6536
Ashley.Davis@dos.fl.gov

/s/ Mohammad O. Jazil
Mohammad O. Jazil
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, Florida 32301
 (850) 270-5938
mjazil@holtzmanvogel.com
zbennington@holtzmanvogel.com

*Counsel for Defendant-Appellant Florida
Attorney General*

*Counsel for Defendant-Appellant Florida
Secretary of State*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7)(B)(i) because it contains 6,294 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: October 31, 2025        /s/ Mohammad O. Jazil
                                 Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing certificate was filed on ECF.

Dated: October 31, 2025        /s/ Mohammad O. Jazil
                                 Mohammad O. Jazil